**WILLBORN v. DEANS et al.**

**No. 9980.**

Court of Civil Appeals of Texas. Austin.

May 23, 1951.

Rehearing Denied June 13, 1951.

Robert I. Wilson, Kerrville, Roscoe Runge and Glenn Capps, both of Mason, for appellant.

Ross Hoffman, Evans J. Adkins, both of Brady, Billy Allcorn, Brownwood, for appellees.

HUGHES, Justice.

A. B. Willborn, appellant, filed two suits in the court below, each having for its purpose the recovery of the office of Sheriff of McCulloch County, Texas. Defendants in one suit were the members of the Commissioners Court of McCulloch County and the defendant in the other suit was J. P. Williamson, the present incumbent of the sheriff's office.

Appellant sought a temporary and permanent mandatory injunction restoring the office of sheriff to him. After notice and hearing on the application for a temporary injunction, the application was denied and this appeal is from the order of denial.

The basic facts are that appellant was the duly elected, qualified and acting sheriff of McCulloch County, when, on March 11, 1951, he signed the following instrument: "I hereby tender my resignation as Sheriff of McCulloch County, Texas."

This instrument was filed with the County Clerk on March 12, presented to the Commissioners Court on March 13, and accepted on the same date, and appellee J. P. Williamson was immediately appointed sheriff and filed the proper oath and bond and assumed the duties of such office.

On March 17, 1951, appellant filed the following instrument with the Commissioners Court:

"Brady, Texas, March 17, 1951.
"To the Commissioners Court and
"County Judge of McCulloch County, Texas,
"Brady, Texas.
"Gentlemen: Some days ago I tendered my resignation to you as Sheriff of McCulloch County, Texas. It is my understanding that I remain Sheriff until such time as my legal successor is named. Due to the fact that no legal successor has yet been named, I am now withdrawing my resignation as Sheriff of McCulloch County, Texas, and I request you to permit me to withdraw my former resignation. In connection herewith I call your attention to Article 16, Section 14, of the Texas Constitution.

"Respectfully submitted,
"/S/ A. B. Willborn."

On March 19 the Commissioners Court unanimously refused the request of Mr. Willborn to withdraw his resignation.

The suits below were filed April 3 and were, by agreement of all parties, consolidated for trial.

Appellant alleges two grounds upon which he bases his claim for relief: (1) that he resigned under duress, and (2) that the incumbent sheriff is not legally qualified to hold the office.

We will discuss the second question first.

Disqualification of the incumbent is based on his nonresidence in McCulloch County.

■■■■ If appellant is entitled to recover the office of sheriff, he will recover it regardless of whether or not Mr. Williamson is eligible to hold the office. If he is not entitled to recover the office, then he has no interest, not common to the public at large, in the incumbent's lack of qualifications. Under such circumstances the remedy of quo warranto is the exclusive remedy to prevent usurpation or unlawful occupancy of the office. Williams v. Castleman, 112 Tex. 193, 247 S.W. 263.

Assuming appellant's resignation to have been freely made then, since it was unconditional, it was effective when accepted by the Commissioners Court. 34 Tex.Jur., pp. 383–385.

We need not discuss the rights, powers, or duties of appellant as a holdover officer, because the record discloses nothing concerning him which transpired between the acceptance of his resignation and the appointment and qualification of his successor. We do, however, call attention to Art. 6252–1, Vernon's Ann.Civ.St., which provides for deputies and assistants in certain cases, to carry on the work of a public officer in cases of a "physical vacancy," and in this connection note that appellant left McCulloch County following his resignation as sheriff.

In determining whether the trial court abused his discretion in denying appellant temporary relief, we will set out appellant's own version of the facts upon which the plea of duress is based.

Appellant had lived in Brady for several years with his wife and three daughters, and had been sheriff since January 1, 1949. In February 1951, appellant was divorced by his wife, and within a week or two remarried. The woman he married was then pregnant. He and his wife went on a honeymoon early in March, returning to Brady about March 11. During his absence a grand jury convened in the county and important criminal cases in which the sheriff was a material witness were considered by it.

Lum Montgomery was appellant's chief deputy, and while on his honeymoon appellant telephoned his deputy to inquire "how everything was getting along."

Mr. Montgomery replied, appellant testified: "Well, he said 'All right,' he said there was a little stir, and I asked him what about, and he said because I had married again, and I told him, 'Well, maybe there will be something said; there usually is something said,' and I asked him if there was anything he needed from me, or if anything had come up that demanded my return, and he said nothing that he couldn't handle."

When appellant returned to Brady on the night of March 10, he again talked with his deputy, Mr. Montgomery, the conversation being, as related by appellant:

"A. He told me there was quite a bit of stir going in the county and that the people were demanding that I resign and leave the county.

"Q. Did he tell you who any of the people were demanding your resignation? A. Yes, sir, he did; he said the Commissioners Court, the District Attorney and the County Judge, Mr. Dick Trail, Mr. Elmer Hicks, and that's all I can remember at this time.

"Q. Did he undertake to advise you what to do, or say what he thought should be done? A. Yes, sir.

"Q. What did he tell you? A. He said there was nothing so far as he could say left for me to do but to resign and get out of the County.

"Q. Did he say why? A. He said there was such a stir in the County that if I stayed here there was going to be plenty of trouble.

"Q. Well, did he indicate that you should resign then and there while you were talking with him? A. Nothing other than he had the resignation written out in his pocket.

"Q. Did he tell you where it was written? A. He said the County Judge had given it to him.

"Q. Did he say anything about Judge Deans having told him to get you to sign

it? A. Yes, sir; he said Judge Deans told him he wanted me to come to see him when I come back, and then he said the Judge said it would be better if I never come back to the courthouse or to McCulloch County, and said it would be best if I signed the resignation without coming back to McCulloch County."

Early the following morning Mr. Montgomery and Mr. C. B. Whitehead, a close personal friend of appellant, went to appellant's house and invited him to drive out in the country with them for a talk. Concerning this talk appellant testified, in response to questions asked by his own counsel, as follows:

"Q. Now, Mr. Willborn, I realize you may have to stop and refresh your memory; we asked you to be particular and mention and make note of everything that was said to you, and we would like for you to tell the court what happened and what was said to you by both of those gentlemen? A. Mr. Whitehead started in telling me how ashamed he was of me, 'You have done the most—' he said, 'I am ashamed of you, and you have done the most disgraceful thing that has ever happened in McCulloch County; it has been worse, and there is more stir about it than any murder could have raised in McCulloch County,' and he said he had been asked by Mr. Elmer Hicks to be one of a committee of twelve or fifteen men to come and ask me to resign or else they were going to see that I was thrown out of office, and said that the district attorney and Mr. Adkins, the county attorney, and the County Judge —he said the district attorney had said that if I did not resign that he would file three charges against me in this county and have me thrown out, and that if he couldn't do it in this county, he would take it to the highest court where he knew he could legally have me thrown out of office; and he told me that I had no friends myself in the county; that 98% of the people were against me; and he said that if I stayed on here and was thrown out of office that my children would never be able to live down the disgrace of an indictment; and he said the only thing for me to do was to resign and leave here because the people

were in such anger; he said the only thing for me to do was to resign and save my children the disgrace. Mr. Montgomery said that he would advise me to resign and said that if I didn't, and went back to the courthouse that I would either have to kill somebody or get killed, and either way it happened that my children would never be able to face anybody else in McCulloch County.

"Q. During that conversation you had with those gentlemen at that time, was anything said to you by either one or by both that the people were very indignant and were congregating about the courthouse and the square? A. They said there had been a steady stream of people in the courthouse, and had been for several days.

"Q. Was it in that connection that Mr. Montgomery told that you would have to kill someone or get killed? A. Yes, sir.

"Q. Did they tell you anything that Judge Deans had said about your resignation? A. He said, so they said—I am not sure which one said that Judge Deans said that it would be better if I resigned; that it would be better if I would sign that resignation and not come back to the courthouse."

Upon returning to Brady from this ride appellant signed the resignation and turned it over to his deputy, Mr. Montgomery, who delivered it to the county judge.

Upon cross-examination appellant testified:

"Q. Did those two men, Lum Montgomery or C. B. Whitehead, while you were riding around in the car with them threaten you in anyway? A. Nothing other than they told me that if I did not do that what would happen to me.

"Q. But they did not threaten you? A. They did not say they would hurt me.

"Q. They were both friendly to you? A. That's what they said.

"Q. Did you at that time have any feeling of fear, or apprehension that Montgomery or Whitehead would do any personal harm to you? A. No, sir.

"Q. You had no fear whatsoever of them? A. That's right."

Appellant left Brady early in the afternoon of March 11, the day on which he signed the resignation, and he gave the following as his reason:

"Q. Did you leave that day because you were in any kind of fear of personal harm? A. I did.

"Q. You actually felt or feared what might happen to you if you stayed here? A. Not particularly for myself, no, but for my daughters; I am not afraid of anybody for myself."

It is evident that by appellant's reference to his daughters he did not intend to imply that any threats had been made against them, for there is no evidence to support such implication.

■ The only threats communicated to appellant were that if he refused to resign legal proceedings would be brought to remove him from office. These threats do not constitute duress, "for a threat to do what one has a legal right to do, as bringing suit in court to enforce a claimed civil right, cannot constitute duress." Dannelly v. Bard, Tex.Civ.App., 62 S.W.2d 301, 308 (Beaumont CCA, Writ Ref.), and many authorities there cited.

The other statements made to appellant by his deputy and Mr. Whitehead, if intended to procure appellant's resignation through fear, failed of their purpose, because appellant expressly denied any personal fear. We do not, however, so construe these statements. To us they mean exactly what they appear to mean,—frank and honest advice from trusted friends of long standing. We do not say the advice was wise. We do say, though, that appellant, knowing all the circumstances, was in position to weigh the statements made to him and to accept or reject the suggestions of his friends intelligently and of his own free will.

As to why the statement was made that if appellant failed to resign and returned to the courthouse that he would have to kill or be killed, we do not know. The record is devoid of showing any feeling on the part of anyone which would engender such thoughts.

It is strange indeed that appellant in requesting permission of the Commissioners Court to withdraw his resignation did not mention that he had been under duress at the time he resigned.

■ Our conclusion is that the evidence is wholly insufficient to support a finding that appellant was forced or compelled to resign against his will.

Appellant asserts the disqualification of the trial judge. It is shown that Judge Newman attended a conference in the office of the county judge and that among those present were the county judge, county attorney, district attorney, and that at this conference the affairs of the sheriff were discussed, and that as a result of this conference Mr. Montgomery and Mr. Whitehead were requested to attempt to procure the resignation of appellant.

Just how little or how much Judge Newman participated in this conference is not shown. His presence only was established.

Appellant cites no authorities in support of this point.

Our Constitution provides: "No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, either by affinity or consanguinity, within such a degree as may be prescribed by law, or when he shall have been counsel in the case." Art. 5, Sec. 11, Const., in part, Vernon's Ann.St.

"These inhibitions are not only mandatory, they are exclusive, they specify all the circumstances which forbid a judge to sit." 25 Tex.Jur., p. 263, citing many cases.

■ Furthermore, the sheriff of McCulloch county was an officer of Judge Newman's court and it was with all propriety, if not his duty, that the judge actively concerned himself about preserving the dignity and respect of his court and all its officers.

It is clear that Judge Newman was not disqualified in law or in fact from hearing this controversy.

The judgment of the trial court is affirmed.

Affirmed.